IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **JESSE JAMES DUPREE and PENNY DUPREE,** | ]<br>]<br>] |
| **Plaintiffs,** | ]<br>] |
| v. | ]   CASE NO. 4:13-cv-01791-KOB<br>] |
| **JAMES ROBERT GREEN, KEHE DISTRIBUTORS, INC., KEHE DISTRIBUTORS, LLC,** | ]<br>]<br>]<br>] |
| **Defendant.** | ] |

## MEMORANDUM OPINION

This matter is before the court on Defendant James Robert Green's "Motion for Partial Summary Judgment on the Issue of Potential Future Lost Earnings." (Doc. 18). Plaintiff Jesse James Dupree filed a complaint against Green in this court alleging that on September 29, 2011 Green negligently operated an automobile, collided with Dupree's motorcycle, and caused injury to Dupree. (Doc. 1, 1-2). Dupree alleges that because of the collision and his injuries, he lost profits from the creation and sale of the television program he was filming on the day of the accident, "Trash to Treasure." (Doc. 1, 4). The parties agree that the court has diversity jurisdiction over these state law claims pursuant to 28 U.S.C. § 1332.

In his motion, Green argues that Dupree's potential lost profits from "Trash to Treasure" are not recoverable because Dupree did not take steps to continue filming the program after Dupree's injury and because Dupree did not yet have a buyer in place for the program. The court finds that Dupree's claim for lost profits is not barred as a matter of law. A question of fact exists

1

for a jury whether Dupree's lost profits were caused by his collision with Green and whether Dupree's lost profits are reasonably ascertainable. Therefore, the court DENIES Green's Motion.

I.      **Standard of Review**

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed

and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

**II.     Facts**

James Robert Green's automobile and Jesse James Dupree's motorcycle collided on September 29, 2011 in Cherokee County, Alabama. (Doc. 19, 2). Dupree's wrist, knee, ankle, and foot were injured during the collision. (Doc. 21, 10-11).

"Dupree was in the process of filming and creating a television program entitled 'Trash to Treasure' as of the date of the accident." (Doc. 19, 3). "Trash to Treasure" is about Dupree's adventures visiting "marathon" yard sales stretching hundreds of miles throughout rural areas of the country. (Doc. 21-1, 39-40). Dupree and his co-stars stop along the way to look for valuables among the junk. *Id*. Dupree also draws out human interest stories from the characters he meets at the sales. *Id.*

Though the concept of "Trash to Treasure" was developed shortly before the accident, the characters and story line had already been determined, shooting schedules had been established, the program's treatment had been created, and the program had been marketed to Base Productions, a production company. (Doc. 21, 15). Base Productions agreed to invest in the project in exchange for sixty percent of the executive producer fees though, ultimately, Dupree declined to work with Base Productions. (Doc. 21, 11).

The collision occurred six hours into "Trash to Treasure's" first day of shooting. (Doc. 19, 4). Dupree planned to film as he traveled between sites at the annual Highway 411 marathon

3

yard sale. *Id.* Dupree planned to have "a minimum of four episodes to put together by the end of the day." (Doc. 19, 5). He was accompanied by co-stars Dwayne and Julia Bramlett, operators of Kennesaw Antiques, who evaluated items found at the yard sales. (Doc. 19, 4).

Dupree's injuries prevented him from completing filming on the day of the accident and on subsequent days. (Doc. 21, 11). Dupree planned to shoot the rest of the day of the accident and "for several subsequent days." (Doc. 21-5, 14). Dupree shot about an hour of additional footage the day after the accident but was limited by his injury. (Doc. 21-6, 11). Dupree performed with his band, Jackyl, two days after the accident in South Carolina. (Doc. 19, 6). Dupree only gave "a partial performance" and "performed sitting on a stool after being driven by his son." (Doc. 21, 9). The Highway 411 sale was the only marathon yard sale that fit Dupree's schedule that year. (Doc. 19, 5). Dupree did not return to film at the next annual Highway 411 marathon yard sale in 2012 because of scheduling conflicts, lingering injuries, and an over saturation of this type of programming by 2012. (Doc. 21, 9; Doc. 21-6, 10).

After filming, Dupree planned to edit the footage and "once [the program's] alive, then there are absolute opportunities for getting on the air." (Doc. 19, 7). However, no one had purchased the program at the time of the accident. (Doc. 21, 10). Even if the program was not initially purchased by a major television network, other networks with more latitude may have subsequently picked up the project. *Id.*

Dupree has prior experience creating television programs. He produced "Two-A-Days," a television program about the Hoover (Alabama) High School football team, which aired on MTV. (Doc. 19, 3). Additionally, Dupree produces and stars in "Full Throttle Saloon," a television program about the world's largest motorcycle rally held in Sturgis, South Dakota,

4

which airs on TruTV. *Id.* Dupree was paid around $259,244 per year on average for his work on "Full Throttle Saloon." (Doc. 21, 15). Dupree also had additional programs in development and has produced pay-per-view programs. (Doc. 19, 3).

## II.     Argument

James Robert Green has moved for summary judgment on Jesse James Dupree's claim for lost profits because Dupree did not have a buyer for "Trash to Treasure" on the date of the accident and because Dupree did not finish filming the program after the accident. The crux of the issue is whether Dupree's claimed lost profits were caused by the collision with Green and whether the lost profits are quantifiable. As discussed below, the evidence presents questions of fact for the jury to weigh and resolve on these issues.

Lost profits represent the missed opportunity for gain suffered by an injured party. Lost profits, first, must "be the natural and proximate, or direct, result of the breach complained of" and, second, must "be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required." *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 327 (Ala. 1987) (emphasis removed). Both Green and Dupree's briefs focus primarily on the second, "reasonable certainty," element about whether Dupree's damages are quantifiable. However, the court must first consider whether Dupree has presented a question of fact to support the claim that his lost profits were caused by the collision with Green.

The court finds that Dupree's evidence raises at least a question of fact for a jury to decide whether Dupree's lost profits were caused by his collision with Green and whether Dupree's lost profits are reasonably ascertainable.

**A.     Fact Questions Exists Regarding Whether Dupree's Lost Profits Were Caused by the Collision.**

Lost profits must "be the natural and proximate, or direct, result of the breach complained of." *Super Valu Stores, Inc.*, 506 So. 2d at 327. "As a general rule, in a personal injury action, . . . evidence of lost profits is allowable only insofar as it is probative of loss of earning power." *Fitzpatrick v. Dean*, 177 So. 2d 909, 910 (Ala. 1965). "The injured person is entitled to compensation for loss of earnings derived from personal effort, skill, or ability or for the destruction or impairment of his ability to perform labor or render service which is essentially and fundamentally personal in character." *Id*. at 910. "[T]he prevailing consideration is whether the profits are a product of personal effort of the plaintiff." *Id.* at 912.[1] Additionally, "[t]he plaintiff must prove that the loss was directly attributable to or a necessary consequence of his injury." *Preston v. Alabama Power Co.*, 401 So. 2d 107, 109 (Ala. Civ. App. 1981).

For example, in *Fitzpatrick*, a salesman suffered a neck injury in an automobile accident. *See* 177 So. 2d at 910. The salesman was the one-third owner of an office equipment manufacturer. *Id*. After his injury, his sales were reduced. *Id*. The salesman was able to recover as lost profits the sales he lost after the accident. *Id*. That no identified buyers for the lost sales existed was irrelevant; rather, what mattered was that the salesman had a track record of

---

[1]A distinction exists between lost profits and loss of earning power, "the difference being that earnings are the fruit or reward of labor, the price of services performed, while profits represent the net gain made from an investment or from the prosecution of some business after the payment of all expenses incurred." *Fitzpatrick*, 177 So. 2d at 911.

Generally, "recovery is not allowed for the loss of business or profits from invested capital or the labor of others no matter how prominent the injured person's part therein or how essential to its successful operation his connection with it may be." *Id.*

successful sales. *Id.* "[T]he diminution in the [salesman's] earnings from his business was *clearly shown* to be a result of his inability to devote the *time and effort to the job* of selling office machines after the accident to the same degree that he did so prior to the accident." *Id.* at 912 (emphasis added). "*At the very least* the evidence of the loss of time from his job could be *considered by the jury* in assessing the damage." *Id.* (emphasis added).

Further, in *Joffrion v. Allstate Ins. Co.*, racetrack owners were injured in an automobile accident. *See* 2014 WL 3518079, at *1 (S.D. Ala. 2014). The owners later sold the racetrack at a loss because "decreased business at the racetrack . . . was due to [one of the owner's] restricted involvement in racetrack operations due to his injuries from the accident." *Id.* at *10. The owners could recover "management fees and commissions that, *but for* the accident, [they] would have been paid . . . for services rendered to the racetrack business." *Id.* at *11 (emphasis added). "The profit [the owners] claim they would have made on the sale of the racetrack, however, does not represent compensation from the business for services rendered in the operation of the business, comparable to wages or salary" and, thus, was not recoverable. *Id*.

Additionally, in *Preston*, the owner of a clothing store suffered a back injury in an automobile accident. *See* 401 So. 2d at 108. After the accident, the owner was unable to carry out her duties as owner of the business, which included purchasing merchandise, keeping regular store hours, and assisting customers. *Id.* at 108-9. The owner could recover "the profits of [the] business [which were] a product of [her] personal effort, skill, or ability." *Id.* at 109.

Only Dupree's losses to his personal earning power caused by the injury are recoverable. Here, Dupree primarily seeks recovery of executive producer fees, music supervision fees, and talent fees. (Doc. 21-1, 9-10). His damages experts state that "net fees from Jesse Dupree's

services would have been $250,000 or more for the first season alone." (Doc. 21-1, 10). A fact question exists regarding whether these fees are "comparable to wages or salary" and are a product of Dupree's "personal effort, skill, and ability" as in *Fitzpatrick*, *Joffrion*, and *Preston*. Dupree argues he could not produce, supervise music for, or appear in "Trash to Treasure" both because he was injured in the collision and because the collision disrupted "Trash to Treasure's" shooting schedule, foreclosing, according to Dupree, the window during which it could be placed with a network. (Doc. 21-6, 10).

A jury might find that Dupree's inability to earn fees for his services are attributable to the collision with Green.[2]

Green argues that Dupree's recovery of any lost profits is barred because too many causal steps (*i.e.* finishing filming and finding a buyer) are necessary to get from Dupree's injury to Dupree's lost profits . First, Green argues that Dupree cannot recover lost profits because he did not even try to finish filming after the collision. In essence, Green argues that Dupree should have mitigated his damages from the collision. The parties disagree over whether Dupree physically could have finished filming "Trash to Treasure." Dupree said he planned to shoot the rest of the day of the accident and "several days after that, *just depending on how fruitful the rest*

---

[2]Some of Dupree's statements and documents suggest that he might seek recovery of the lost value of "Trash to Treasure" merchandising revenue, similar to the merchandise sold in connection with "Full Throttle Saloon." (*See e.g.* Doc. 21-2, 12, Doc. 21-3, 7; Doc. 21-5, 14). Dupree's damages experts do not appear to include this category in their calculation of damages, however. Profits from the sale of merchandise or other items subsequent to the initial sale of "Trash to Treasure" are not recoverable because these profits are too speculative. While Dupree's efforts to create the program might lead to merchandise sales, these sales are not directly "derived from [Dupree's] personal effort, skill, or ability" and are not directly impaired by the "destruction or impairment of [Dupree's] ability to perform labor or render service." The causal connection between the collision and potential merchandise sales is simply too remote.

*of that day and the next day had been*." (Doc. 21-5, 14) (emphasis added). In fact, Dupree did shoot additional footage the day after the accident but was limited by his injury. (Doc. 21-6, 11) ("I shot for, seriously, just maybe an hour the next day, you know, from sitting down and – you know, with my leg propped up.").

Green argues that Dupree performed with his band two days after the accident and, thus, his injuries could not have prevented Dupree from filming after the accident. (Doc. 19, 12). However, Dupree only gave "a partial performance" and "performed sitting on a stool after being driven by his son." (Doc. 21, 7). Performing a concert, while clearly strenuous, is not the same as filming a television program, which here involves standing and riding a motorcycle. Taking the facts in the light most favorable to Dupree, Dupree tried to continue filming while injured. Green also argues that Dupree should have returned the following year to film. However, Dupree states that he did not return to film in 2012 because he was still injured, filming did not work "scheduling wise," and the networks were "oversaturated." (Doc. 21-6, 10). In short, "[t]hat moment had passed." *Id.*

Second, Green argues that Dupree's lost profits are not recoverable because he had not yet secured a buyer for "Trash to Treasure." In fact, Green argues that "[h]ad Dupree, with contract in hand, been on day one of shooting the series 'Trash to Treasure' and suffered injuries which prevented him from filming the season and the series then be cancelled, we would have a different situation on our hands." (Doc. 26, 7). However, Dupree's business strategy is predicated on fully filming his television programs and then selling them, completely developed, to a buyer. (Doc. 21-5, 15). "I eliminate anybody having to use their imagination. I bring it to reality. And once it exists, you can't do anything but deal with it." *Id.* This strategy was successful with

"Two-A-Days" and "Full Throttle Saloon." *Id.* Dupree planned to finish filming before determining which network to approach. (Doc. 21-5, 16; Doc. 21-6. 9). This approach was not customary in the reality TV industry. (Doc. 21-2, 7). Dupree's industry expert, Ryan Nord, states that "[t]he great majority of 'reality' or 'docu-style' television concepts are presented and sold to cable networks with the bare minimum of customary presentation materials." *Id.* "For an executive producer to go beyond the customary presentation materials and expend the resources necessary to shoot hours of footage for the purpose of presenting full-length episodes to the networks is extraordinary." (Doc. 22-2, 8). However, this business strategy could lead to significantly higher executive producer fees. *Id.*

Green is not entitled to summary judgment merely because Dupree planned to complete his program before approaching potential buyers. Just like in *Fitzpatrick*, Dupree had a viable product to sell and that a buyer has not yet been identified is irrelevant. "Trash to Treasure" was more than a "hypothetical project" as Green asserts. Dupree had already created more content than was typical for this industry and had a track record of success. In fact, Dupree and his co-producer already negotiated with BASE Productions to work on the project. (Doc. 21-5, 17). While the existence of a contract and buyer may be especially probative of future profits in a breach of contract scenario, the existence of a contract is less important in a tort setting where the injured party has no notice of the oncoming injury. The lack of an identified buyer and contract does not make Dupree's lost profits too causally remote as a matter of law. Rather, a triable question exists for a jury whether Dupree's lost profits were caused by the accident.

Here, a jury must determine whether Dupree's lost executive producer fees, music supervision fees, and talent fees on "Trash to Treasure" were caused by his collision with Green.

This determination depends on the jury's analysis of the credibility of witness testimony. The court must refrain from supplanting the jury by weighing the evidence and making credibility determinations. *See Anderson*, 477 U.S. at 255; *Stewart*, 232 F.3d at 848; *Graham*, 193 F.3d at 1282. Thus, the court finds that summary judgment is not appropriate.

B.  **Fact Questions Exist Regarding Whether Dupree's Lost Profits are Reasonably Ascertainable**.

Once Dupree shows that lost profits were caused by his collision with Green, he must then show that the lost profits are quantifiable. Lost profits "must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required." *Super Valu Stores, Inc.,* 506 So. 2d at 327. However, "profits which are speculative or remote may not be considered as an element in estimating damages." *Preston*, 401 So. 2d at 109. Evidence of lost profits may be shown in several different ways and Green's focus on Dupree's lack of a contract is misplaced because a contract is just one potential indicia of the value of lost profits.

Past performance is one method to show evidence of lost profits. *See Fitzpatrick*, 177 So. 2d at 910. Although Dupree has no evidence of past performance for "Trash to Treasure," the lack of past performance does not preclude recovery of lost profits. "Current Alabama law, like the law of other states, authorizes recovery of anticipated profits of an unestablished business, if proved with reasonable certainty." *Super Valu Stores, Inc.*, 506 So. 2d at 327.

New businesses may provide evidence of lost profits by a variety of methods. *Morgan v. South Cent. Bell Telephone Co.*, 466 So. 2d 107, 116 (Ala. 1985) (holding that industry expert

11

and a statistician's expert testimony comparing newly established periodontist office's to sufficiently similar "horizontal businesses" provided a basis for the jury to value lost profits to a reasonable certainty). In fact, when "the amount of damages cannot be estimated with certainty . . . [there is] no objection to placing *before the jury* all the facts and circumstances of the case, *having any tendency* to show damages, or their probable amount." *Super Valu Stores, Inc.*, 506 So. 2d at 328 (first emphasis added).

Here, Dupree's evidence presents a triable question of fact for a jury on the existence and amount of lost profits. Dupree seeks recovery of executive producer fees, music supervision fees, and talent fees for his work on "Trash to Treasure." (Doc. 21-1, 9-10). Dupree has previously provided these services on television programs such as "Two-A-Days" and "Full Throttle Saloon" and planned to provide these services on "Trash to Treasure." Dupree's past programs and "Trash to Treasure" may be found by a jury to be comparable horizontal businesses. Further, Dupree's damages experts may provide a basis for the jury to find Dupree's lost profits to a reasonable certainty. Like in *Morgan*, Dupree's industry experts' reports show Dupree's lost profits and these experts have not been challenged by Green. Their opinions are an additional basis a jury could use to find that Dupree's lost profits can be shown to a reasonable certainty.

A jury question exists whether Dupree's lost profits can be calculated to a reasonable certainty based on his past success, comparison to his other programs, or based on his experts' testimony. Thus, the court finds that summary judgment is not appropriate.

## IV.   CONCLUSION

In summary, the court finds that when the facts are taken in the light most favorable to Plaintiff Jesse James Dupree, Defendant James Robert Green is not entitled to summary

judgment on Dupree's claim for lost profits. A question of fact exists for a jury whether Dupree's lost profits were caused by his collision with Green and whether Dupree's lost profits are reasonably ascertainable. Thus, the court DENIES Green's "Motion for Partial Summary Judgment on the Issue of Potential Future Lost Earnings."

DONE and ORDERED this 3d day of September, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE